

1999 Decisions

11-22-1999

# NJ Turnpike Auth v PPG Ind Inc

Precedential or Non-Precedential:

Docket 98-6309

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"NJ Turnpike Auth v PPG Ind Inc" (1999). *1999 Decisions*. Paper 307.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/307

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 22, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6309

NEW JERSEY TURNPIKE AUTHORITY,
          Appellant

v.

PPG INDUSTRIES, INC; NATURAL PRODUCTS REFINING
COMPANY; F.S.F. COMPANY; ALLIED-SIGNAL, INC;
MUTUAL CHEMICAL COMPANY OF AMERICA;
OCCIDENTAL CHEMICAL CORPORATION; MAXUS
ENERGY CORPORATION; OCCIDENTAL PETROLEUM
CORPORATION; OXY-DIAMOND ALKALI CORPORATION;
CHEMICAL LAND HOLDINGS, INC.; MARTIN DENNIS
COMPANY; GEORGE M. BREWSTER & SONS, INC.;
FELHABER CORPORATION; MOHAWK CONSTRUCTORS,
INC.; MOHAWK CONSTRUCTORS II, INC.; REID
CONTRACTING COMPANY, INC.; KLEVENS
CORPORATION; HORN CONSTRUCTION COMPANY, INC.;
NEW JERSEY MANUFACTURERS INSURANCE COMPANY;
THE TRAVELERS INSURANCE COMPANY;
UNITED STATES FIDELITY GUARANTY COMPANY;
AMERICAN MUTUAL LIABILITY INSURANCE COMPANY;
JOHN DOE GENERATORS; JOHN DOE OPERATORS;
JOHN DOE OWNERS; JOHN DOE TRANSPORTERS;
JOHN DOE AFFILIATES

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Docket No. 93-cv-02037)
District Court Judge: Honorable John W. Bissell

Argued July 13, 1999

Before: BECKER, Chief Judge, ROTH, and RENDELL,
Circuit Judges

(Filed November 22, 1999)

Ross A. Lewin, Esq. (ARGUED)
Jamieson, Moore, Peskin &
 Spicer, P.C.,
300 Alexander Park
Princeton, NJ 08543-5276

Warren B. Kasdan, Esq.
Schwartz, Tobia, Stanziale,
 Rosensweig & Sedita, P.A.
22 Crestmont Road
Montclair, NJ 07042

 Attorneys for New Jersey
 Turnpike Authority

George E. McGrann, Esq. (ARGUED)
Sweeney, Metz, Fox, McGrann &
 Schermer, L.L.C.,
11 Stanwix Street
Pittsburgh, PA 15222

Joseph F. Lagrotteria, Esq.
St. John & Wayne
Two Penn Plaza East
Newark, NJ 07105
Attorneys for PPG Industries, Inc.

David W. Field, Esq. (ARGUED)
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07068

 Attorneys for Allied-Signal, Inc.

2

Thomas E. Starnes, Esq. (ARGUED)
Andrews & Kurth, L.L.P.
1701 Pennsylvania Ave., N.W.
Suite 200
Washington, D.C. 20006

Lori A. Mills, Esq.
William L. Warren, Esq.
Drinker, Biddle, & Reath, L.L.P.
105 College Road East,
 P.O. Box 627
Princeton, NJ 08542-0627

 Attorneys for Occidental
Chemical Corporation and Maxus
Corporation

OPINION OF THE COURT

RENDELL, Circuit Judge.

In this CERCLA and Spill Act case, the appellant, the New Jersey Turnpike Authority ("Turnpike") seeks to hold the appellees liable for contribution for the contamination of a number of sites along the Turnpike with chromate ore processing residue, or COPR, under standard theories of liability and under an alternative liability theory. We conclude that the Turnpike has not produced sufficient evidence to survive appellees' summary judgment motion under either CERCLA or the Spill Act or under an alternative liability theory, and will affirm the District Court's order on this basis.

I. Factual and Procedural Background

This case is the latest of a series of legal actions attempting to affix liability against these appellees for COPR contamination in New Jersey in both the state and federal courts.  The instant litigation centers around seven different sites along the New Jersey Turnpike that the Turnpike alleges have been contaminated with COPR. In this action, the Turnpike relies largely upon prior investigations and

3

actions of other parties, and the records made in connection with those cases, to prove liability of appellees for contribution for the sites in question.

The New Jersey Department of Environmental Protection ("NJDEP") has denoted these areas as site numbers, 7, 20, 21, 56, 131, 192, and 201.[1] According to the Turnpike, these seven sites, among others, received COPR, directly or indirectly, from appellees from the early 1950s to the mid 1970s. A. at 46a–47a.

The three appellees, Allied–Signal ("Allied"), PPG Industries ("PPG"), and Occidental and Maxus Corporation ("Occidental") involved in this appeal, or their corporate predecessors, were processors of chromium ore. A. at 30a, 34a. From the early 1900s until 1976, Allied, PPG, and Occidental were the only companies in New Jersey processing chromium. A. at 499a, 501a. Outside of their plants, the next closest chromate chemical production facility was in Glens Falls, New York. A. at 500a, 1057a. Allied, PPG, and Occidental sold or gave the COPR produced at their plants to contractors for construction fill or other uses. A. at 962a, 903a, 923–38a, 1241a, 894a, 957a–960a, 897a, 922a, 981a. Neither the appellees nor the Turnpike has kept records of COPR disposal or purchase. A. at 903a, 1069a, 681a, 713a.

The NJDEP began investigating possible chromium contamination at sites in New Jersey in the 1980s.[2] In 1988, the NJDEP issued a "Directive" to Allied–Signal, PPG, and Occidental. The NJDEP stated that the Directive was issued for the following purposes:

> in order to notify [Allied, PPG, and Occidental] that the Department, pursuant to the provisions of the [Spill Act] has determined that it is necessary to remove or arrange for the removal of certain hazardous

---

1. Earlier versions of the record below indicate that the Turnpike initially focused on site 198, but the parties appear to be in agreement that it is site 192 that is at issue in this case.

2. The Turnpike was made aware of the presence of COPR at some of the sites at issue in this case from the Director of the Hazardous Waste Task Force of New Jersey in 1984. A. at 281a.

> substances, and in order to notify [Allied, PPG, and Occidental] that the Department believes them to be responsible for the discharge of such hazardous substances. A. at 499a.

The Directive put appellees on notice of 118 contaminated sites, including four of the sites at issue here, Sites 7, 20, and 21 in Jersey City, and Site 56 in Kearny. A. at 507–12a. The Directive assigned collective responsibility for these sites to Allied, PPG, and Occidental, because it could not identify which company had discharged chromate waste at these and other sites. A. at 502a. In 1990, Occidental entered into an administrative consent order with the NJDEP relating to 26 chrome-contaminated sites in Kearny, including Turnpike sites 56 and 131. 339a–364a. Occidental agreed, via this administrative consent order, to propose and implement remedial measures at all of the Kearny sites listed. A. at 343a–347a.3  This order did not include an admission of liability or fault by Occidental for the sites. A. at 343a, 362a, 495a. Occidental has spent more than $700,000 on investigation and remedial measures at the Kearny sites, and over $47 million at the non-Turnpike Kearny sites. A. at 1138a–41a. PPG has also signed an administrative consent order whereby it has been investigating and remediating over 55 sites in Hudson County. A. at 626–68a.

The NJDEP issued another Directive in 1989 that set forth the following as its "findings": 1) Allied had reported that it could not account for the disposition of all its chromate chemical waste, but that it had been used as fill at offsite locations and had been stored at one of its production sites and then used as fill in construction projects; 2) Occidental employees had reported that chromate chemical waste had been used as fill in wetlands areas or in construction projects and roadway construction; and 3) during the late 50s and early 60s, PPG allowed approximately 40 tons per day of chromate chemical production waste to be taken free of charge from the PPG

---

3. When the NJDEP identified Turnpike Site 201 as a new chrome site in 1996, Occidental agreed to treat the site as one covered by the administrative consent order. A. at 494a–95a.

site. A. at 524–26a. The Directive also cited the testimony of PPG employees in prior cases that its waste was used as fill in Jersey City, and was sold and used for fill in construction and industrial sites. A. at 527a. Other NJDEP Directives were issued that discussed how waste from the PPG and Allied plants were used as fill, and these Directives also observed that both Allied and PPG had entered into administrative consent orders with the NJDEP to determine remedial plans without admitting liability. A. at 551–52a, 559–62a, 585–86a, 593–620a, 626a–34a, 635–664a.

This activity spawned a series of lawsuits in state and federal courts seeking damages for personal injury and property claims arising out of chrome ore residue, and the courts in Hudson County, New Jersey, in particular, have been the locus of a number of suits.4 See, e.g., Jersey City Redevelopment Authority v. PPG Indus., Inc., Civ. A. No. 85-2014, 1987 WL 54410 (D.N.J. Sept. 3, 1987), aff'd, 866 F.2d 1410–11 (3d Cir. 1988); Florence Trum, et al. v. Allied Signal, et al., Docket No. W–14248–89 (N.J. Super. Ct. Law Div. Feb. 11, 1993) (order granting summary judgment in favor of PPG and Allied); Gertrude Settle v. PPG Indus., Inc. et al., Docket No. W–10654–92 (N.J. Super. Ct. Law Div. June 7, 1996) (order granting summary judgment in favor of Allied); PPG Indus., Inc. v. Lawrence Construction Co., et al., Docket No. L–195–93 (N.J. Super. Ct. Law Div. April 11, 1996) (consent order). The Hudson County litigation that is relied upon most frequently by the Turnpike in this appeal, Exxon v. PPG Indus., et al., was filed in 1990, and the appellees, or their corporate predecessors, were named in this suit.

In May 1993, the Turnpike filed suit in District Court, alleging claims under CERCLA, the New Jersey Spill Act, tort, contract, and quasi-contract claims, and a declaratory judgment claim against numerous defendants, including insurance companies, construction and trucking companies, and corporations alleged to have produced

_____

4. For example, Allied's counsel in this matter has handled approximately fifteen cases on behalf of the corporation in the state and federal courts in New Jersey. A. at 1285a.

COPR. Discovery efforts in this matter were sporadic at best. In February, 1994, the Magistrate Judge entered a case management order that indicated that discovery would be conducted in phases, and that the first phase of discovery would include document requests, interrogatories, and depositions. The parties exchanged documents and interrogatory answers shortly thereafter. For a period of at least twelve months afterward, however, the Turnpike sought no discovery from any defendant or third party on the question of liability. We also note that there appeared to be little or no discovery taken by any party for almost two years.

On October 16, 1996, the Magistrate Judge issued an order closing fact discovery at the request of Allied, so that its dispositive motion could be filed. The Turnpike appealed this decision to the District Court and received an extension of time to pursue fact discovery on the issue of liability through March 15, 1997, and on the subject of damages through September 15, 1997. The Turnpike served five deposition notices, and withdrew all but one. In sum, the Turnpike did take one, one hour deposition in this case in 1997, served written discovery requests on the appellees, and it obtained from various sources 102 deposition transcripts, but it concedes that it did not review all of those transcripts. Allied, PPG, and Occidental moved for summary judgment, as did the Turnpike. In support of its motion for summary judgment, the Turnpike quoted and utilized deposition testimony from prior actions and also relied heavily on statements made in the NJDEP Directives and the administrative consent orders that the appellees had entered into with the NJDEP. The District Court heard oral argument on the motions, and then ruled in favor of Allied, PPG, and Occidental on the Turnpike's federal and state law claims. This order became final upon dismissal of all other claims.5

_____

5. Judgment had been entered previously in favor of USF&G, Travelers Insurance Co., and N.J. Manufacturers Insurance Co., and is not a subject of this appeal. A. at 241–44a. Summary judgment was granted in favor of appellees on May 15, 1998. On August 4, 1998, the District Court entered an order: 1) dismissing all of the claims against the John

7

The focus of the District Court's opinion was the Turnpike's assertion that an alternative liability theory should be applied. In its opinion, the District Court noted that the Turnpike had admitted it could not produce direct evidence to prove CERCLA liability, and that it had instead urged the Court to apply an alternative liability doctrine, whereby the "burden would shift to the Generator Defendants to prove that COPR originating from its plant was not the source of the COPR detected on each site in question." New Jersey Turnpike Authority v. PPG Industries, Inc., 16 F. Supp.2d 460, 468 (D.N.J. 1998). In examining the Turnpike's alternative liability arguments, the District Court noted that under any burden-shifting framework, a plaintiff still had an initial burden of demonstrating that two or more actors joined as defendants acted tortiously toward that plaintiff, and that all culpable defendants were joined in the action. See id. at 470 (citing Shackil v. Lederle Laboratories, 561 A.2d 511 (N.J. 1989); McLaughlin v. Acme Pallet Co. 658 A.2d 1314 (N.J. Super. Ct. App. Div. 1995)). Without deciding the question of whether a theory of

_____

Doe Defendants without prejudice; 2) stating that any and all claims by the Turnpike against Natural Products Refining Co., F.S.F. Company, Mutual Chemical Company of America, Oxy-Diamond Alkali Corporation, Martin Dennis Company, George M. Brewster & Sons, Inc., Felhaber Corporation, Reid Contracting Company, Inc., Klevens Corporation, Horn Construction Company, and American Mutual Liability Insurance Company were acknowledged by the Turnpike to be defunct, and dismissing those claims; 3) dismissing counterclaims and cross claims by the appellees with the exception of the counterclaims brought by Occidental, which were "stayed and administratively terminated pending disposition of any appeals from this Court's Order dated May 15, 1998." The order was accompanied by correspondence stating that the order was issued to ensure finality prior to appeal, and that no 54(b) certification was necessary. We questioned whether this court had jurisdiction in the absence of a 54(b) certification, and counsel sought a 54(b) certification from the District Court. A 54(b) certification was entered by the District Court and presented to this court at argument. We conclude that any jurisdictional defects inherent in the District Court's August 4, 1998 order were cured by the 54(b) certification, and that we therefore have jurisdiction to consider this appeal. See Instructional Systems, Inc., 35 F.3d 813, 818 n.9 (3d Cir. 1994); Feather v. United Mine Workers of America, 711 F.2d 530, 535 (3d Cir. 1983).

alternative liability is applicable to cases brought under CERCLA, the District Court found that even if this theory could apply, the Turnpike had not demonstrated that alternative liability should be applied to this case. See id. at 470–71. The District Court noted that the Turnpike was not a proper "innocent" party to be aided by an alternative liability doctrine, as it was also potentially liable for the COPR contamination at its sites under CERCLA, and that the Turnpike, rather than the appellees, was in a better position to uncover evidence relating to causation. [6] See id. For these reasons, the District Court declined to apply the doctrine of alternative liability to the Turnpike's claims.

The District Court also concluded that the Turnpike's evidentiary proffers were not sufficient in and of themselves to establish a question of material fact, under either CERCLA or the Spill Act. The District Court noted that the Turnpike had not produced sufficient competent evidence to demonstrate that Allied or PPG's facility had deposited COPR on any of the sites at issue, and that the Turnpike had not produced sufficient evidence against Occidental as to sites 7, 20, 21 and 192. See id. at 472. The District Court then took a closer look at the evidence produced by the Turnpike against Occidental with respect to sites 56, 131, and 201 and concluded that the Turnpike could not produce adequate evidence against Occidental with respect to these sites to survive summary judgment under CERCLA. See id. at 472–75. The District Court also found that the Turnpike had not produced sufficient evidence to survive summary judgment on its Spill Act claims, and it also addressed and denied the Turnpike's other state law

_____

6. The District Court made the following comments as to proof of causation:

> [O]ne of the primary justifications for invoking the alternative liability doctrine -- to provide redress for injuries that would not be
> remedied otherwise -- is plainly absent here. The alleged damage here -- the environmental harm -- is already being addressed in ongoing NJDEP proceedings, which have already secured the agreement of Occidental to address three of the seven sites in question.

16 F. Supp.2d at 471.

claims. The Turnpike argues on appeal that the District Court erred by 1) failing to consider evidence that would link Allied, PPG, and Occidental to the COPR found at the Turnpike sites; 2) refusing to shift the burden of proving causation to the defendants under an alternative liability theory; and 3) exercising supplemental jurisdiction over the Turnpike's state law claims, where the claims presented novel and complex issues of state law.

The District Court had subject matter jurisdiction over this case pursuant to 28 U.S.C. S 1331 and 42 U.S.C. S 9613(b). We have jurisdiction pursuant to 28 U.S.C. S 1291. Our review of the District Court's grant of summary judgment is plenary. See United States v. USX Corp., 68 F.3d 811, 819 (3d Cir. 1995).

II. Discussion

A. CERCLA

Both CERCLA, 42 U.S.C. S 9601, and the Superfund Amendments and Reauthorization Act ("SARA"), were enacted to provide for liability and remediation of hazardous substances in the environment and for cleanup of inactive hazardous waste sites. Section 107 of CERCLA assigns liability to four categories of "potentially responsible parties" or PRPs for costs of removal or remediation or hazardous waste. 42 U.S.C. S 9607(a). A PRP includes: 1) the current owner or operator of a facility; 2) any person who owned or operated the facility at the time of the disposal of a hazardous substance; 3) any person who arranged for disposal or treatment, or arranged for transport for disposal or treatment of hazardous substances at a facility; and 4) any person who accepts or accepted hazardous substances for transport to sites selected by such person. See New Castle County v. Halliburton NUS Corp., 111 F.3d 1116, 1120 (3d Cir. 1997).

In order to prove CERCLA liability under section 107, a plaintiff must prove: 1) that the defendant is a PRP; 2) that hazardous substances were disposed of at a "facility"; 3) that there has been a "release" or "threatened" release of hazardous substances from the facility into the

10

environment; and 4) that the release or threatened release has required or will require the plaintiff to incur"response costs." See 42 U.S.C. S 9607(a); United States v. CDMG Realty Co., 96 F.3d 706, 712 (3d Cir. 1996). A section 107 cost recovery action may only be pursued by an innocent party that has undertaken hazardous waste cleanup, and section 107 imposes strict liability and joint and several liability on PRPs for costs associated with cleanup and remediation. Id. at 1120-21. In order to prove a case where a CERCLA plaintiff asserts that a PRP has "arranged" for the transportation or disposal of hazardous substances, our prior case law is clear that such a plaintiff "must simply prove that the defendant's hazardous substances were deposited at the site from which there was a release and that the release caused the incurrence of response costs." See United States v. Alcan Aluminum Corp., 964 F.2d 252, 266 (3d Cir. 1992).

Section 113 of SARA provides for recovery by way of contribution by one PRP from another PRP. See  42 U.S.C. S 9613(f)(1). A section 113 contribution action allows a PRP to recover a portion of its expenditures when that PRP believes that it has assumed a share of the costs that is greater than its equitable share under the circumstances. See New Castle County, 111 F.3d at 1121-22; see also In re Reading Co., 115 F.3d 1111, 1119 (3d Cir. 1997). A section 113 plaintiff must demonstrate that the defendants are liable or potentially liable under 107; the elements for both claims are essentially the same.7See 42 U.S.C. S 9613(f)(1); Prisco v. A & D Carting Corp., 168 F.3d 593, 603 (2d Cir.

_____

7. Under Section 113(f)(1), once a contribution plaintiff has demonstrated section 107 liability, it must then demonstrate that apportionment is feasible. See New Castle County, 111 F.3d at 1122; United States v. Colorado & Eastern Railroad Co., 50 F.3d 1530, 1536 (10th Cir. 1995). A court "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." See 42 U.S.C. S 9613(f)(1). In any given case, a court may consider several factors or a few, depending on the totality of the circumstances and equitable considerations. See New Castle County, 111 F.3d at 1122-23; 50 F.3d at 1536 (discussing approaches to apportioning contribution claims under S 113(f)(1)). We will not discuss the apportionment question, given that we find that the Turnpike has not demonstrated CERCLA liability on the part of the appellees.

11

1999); Bedford Affiliates v. Sills, 156 F.3d 416, 427 (2d Cir. 1998); Redwing Carriers, Inc. v. Saraland Apts. , 94 F.3d 1489, 1496 (11th Cir. 1996); see also CDMG Realty Co., 96 F.3d at 712. However, section 113 does not "in itself create any new liabilities; rather, it confirms the right of a potentially responsible person under section 107 to obtain contribution from other potentially responsible persons." New Castle County, 111 F.3d at 1121. The Turnpike is a PRP, as the current owner and operator of the sites, and its action against other PRPs is properly characterized as a section 113 action. See id. at 1120–22.8

The Turnpike argues that all three appellees are PRPs by virtue of their having arranged for disposal and transport of the COPR at the seven sites. See 42 U.S.C. S 9607(a)(3).

_____

8. We note at the outset that the Turnpike is seeking recovery primarily of litigation costs; we express no view as to what they could recover in this action. In the course of discovery, the Turnpike summarized its damage claim as follows:

| | | |
|---|---|---|
| IAG, Ltd. services | $ 99,810.36 | "insurance archeology" related to a dismissed declaratory judgment action against the Turnpike's insurers |
| SMC Environmental Services Group | $ 850,699.95 | management services for litigation, unspecified as to the sites |
| Louis Berger & Associates | $ 184,089.13 | unspecified as to activities or sites where costs incurred |
| Sills, Cummis | $ 801,960.33 | legal fees and costs |
| Wolff & Samson | $ 19,899.11 | legal fees and costs |
| Schwartz, Tobia, and Stanziale, | $ 255,108.40 | legal fees and costs |
| R–1105 Sarria Construction | $ 40,379.51 | to erect a fence around Site 20 as an interim remedial measure |
| Rutgers University | $ 31,700.00 | unspecified |

Paulus, Sokoloski $ 85,729.84 unspecified

& Sartor

TOTAL                                                $2,358,376.63

Although the Turnpike acknowledges that in setting forth its proofs, it is required to prove the link described in our decision in Alcan, it also argues that this requirement is not all that exacting, due to the remedial purpose of CERCLA and less stringent notions of proof and causation underlying a CERCLA claim. See Alcan, 964 F.2d at 266–69. The Turnpike also argues that in analyzing its arguments under the statutory elements of section 113, we should look to the entire eastern spur of the Turnpike as the "facility" in question. We cannot accept either of these contentions.

First, we find that the Turnpike has misconstrued the nature of the proof required of a plaintiff under CERCLA. It is true that as a CERCLA plaintiff, the Turnpike need not prove causation in the traditional sense of the word for the appellees to be found liable. However, the statute and our case law require some connection between the actions of the appellees and the COPR contamination at the sites in question.[9] We therefore agree with the District Court in this matter that in order to fulfill CERCLA's "causation" requirements, the Turnpike must offer some proof that Allied, PPG, and Occidental deposited, or caused the disposal of, COPR at each of the sites at issue in this case. See Alcan, 964 F.2d at 266. Some courts, in describing this evidentiary burden, have termed it a "nexus" requirement. See, e.g., General Elec. Co. v. AAMCO Transmissions, Inc., 962 F.2d 281, 286 (2d Cir. 1992). Therefore, we agree that the burden that CERCLA requires is not an onerous one, but we also observe that the Turnpike must nevertheless produce sufficient evidence to meet it.

Second, the Turnpike also argues that the eastern spur of the New Jersey Turnpike is the "facility" in question, and that the sites at issue here can be considered the

_____

9. In the District Court's words:

> While it is not necessary for [the Turnpike] to . . . trace the cause
> of the response costs to each Generator Defendant, it is not enough
> that it simply prove that each Generator Defendant produced COPR
> and that COPR was found at each of the sites in question and ask
> the trier of fact to supply the link.

16 F. Supp.2d at 469.

13

environmentally impacted portions of the overall "facility"
for the purposes of determining whether the appellees are
liable.10 However, allowing the "facility" to be the entire
eastern spur, where the Turnpike's claim seeks costs
relating to seven specific sites, would result in an
unwarranted relaxation of the "nexus" required. If the
Turnpike seeks contribution for contamination at the sites,
it may not merely prove deposits occurred along the
"eastern spur."

B. Spill Act

The Spill Act is the New Jersey environmental protection
act that resembles CERCLA in its purpose, although it sets
forth a distinct strict liability scheme. The Spill Act
provides:

> Any person who has discharged a hazardous
> substance, or is in any way responsible for any
> hazardous substance, shall be strictly liable, jointly
> and severally, without regard to fault, for all cleanup
> and removal costs, no matter by whom incurred.

N.J.S.A. S 58:10-23.11g(c)(1).11

In this appeal, the Turnpike also argues that the Spill Act
should receive an expansive construction, for its strict
liability scheme includes any person who is "in any way
responsible for any hazardous substance," and the Spill Act
is supposed to be construed liberally to effectuate its
purposes. See N.J.S.A. S 58:10-23.11x. The Supreme Court
of New Jersey has determined that a party "even remotely
responsible for causing contamination will be deemed a

_____

10. Section 101(9) of CERCLA defines a facility as "A) any building,
structure, installation, equipment, pipe or pipeline (including any pipe
into a sewer or publicly owned treatment works), well, pit, pond, lagoon,
impoundment, ditch, landfill, storage container . . . or B) any site or
area
where a hazardous substance has been deposited, stored, disposed of, or
placed, or otherwise come to be located [in that site or area]." 42 U.S.C.
S 9601(9).

11. See also N.J.S.A. S 58:10-23.11f(a)(2) (setting forth private right of
contribution for cleanup costs against persons "in any way responsible
for a discharged substance who are liable for the cost of the cleanup").

14

responsible party under the Act."12  See In re Kimber Petroleum Corp., 539 A.2d 1181, 1189 (N.J. 1988); State Dept. of Environmental Protection v. Ventron, 468 A.2d 150, 165-66 (N.J. 1983). However remote a party's responsibility under the Spill Act may be, the statute nevertheless requires some degree of particularity; one cannot be "responsible" for a hazardous substance without having some connection to the site on which that substance was deposited. In other words, like CERCLA, the Spill Act places a burden on the Turnpike to demonstrate some connection or nexus between the COPR at the sites in question and the appellees in this case.13 See Marsh, 703 A.2d at 931; Kimber, 539 A.2d at 1182.

C. Alternative Liability

The Turnpike argues that it produced sufficient evidence to survive summary judgment apart from the application of an alternative liability theory, but it also argues that the District Court erred by failing to shift the burden of proof to Allied, PPG, and Occidental via common law principles of alternative liability on the basis of the evidence that it produced of the appellees' COPR production and disposal. Although general tort law principles require a plaintiff to bear the burden of proving causation, see Restatement (Second) of Torts, S 433B(1) (1965), courts have fashioned exceptions to this rule in situations in which plaintiffs would be otherwise unable to recover, such as alternative liability, market share liability, and enterprise liability. See, e.g., Doe v. Cutter Biological Inc., 971 F.2d 375 (9th Cir. 1992); Smith v. Cutter Biological, Inc., 823 P.2d 717 (Haw.

_____

12. As the owner and operator of the sites in question at the time of the contamination at issue in this case, the Turnpike is a responsible party under the Spill Act. See Marsh v. NJDEP, 703 A.2d 927, 931-33 (N.J. 1997).

13. A similar interrelation exists between the contribution and the direct cost recovery provisions of the Spill Act as is found in CERCLA. N.J.S.A. S 58:10-23.11f(a)(2) provides:

        In an action for contribution, the contribution plaintiffs need prove
        only that a discharge occurred for which the contribution defendant
        or defendants are liable pursuant to [S 58:10-23.11g(c)(1)].

15

1991); Hymowitz v. Eli Lilly & Co., 539 N.E.2d 1069, 1077 (N.Y. 1989) (applying market share liability theory); Minnich v. Ashland Oil Co., Inc., 473 N.E.2d 1199 (Ohio 1984); Sindell v. Abbott Laboratories, 607 P.2d 924, 933, 937 (Cal. 1980) (discussing reasons for applying market share rather than enterprise liability theory). The general rule for alternative liability is: "Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm." Restatement (Second) of Torts, S 433B(3). The case that effectively established the doctrine of alternative liability is Summers v. Tice, 199 P.2d 1 (Cal. 1948). In Summers, two hunters discharged their guns in the direction of the plaintiff, and at trial, the plaintiff was able to establish that both hunters were negligent, but the plaintiff could not identify the shot that hit him. As a response to the problem of proof faced by the injured plaintiff, the court required each of the hunters to prove that the shot that injured the plaintiff did not come from his gun. The justification for the imposition of alternative liability is to hold wrongdoers responsible for their conduct, and not to allow them to "escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm." Restatement (Second) of Torts, S 433B(3) cmt. f.

The application of an alternative liability theory does place certain requirements on a plaintiff before any burden shifting occurs. Some courts have set forth the following test for alternative liability: 1) all defendants must have acted tortiously; 2) the plaintiff must have been harmed by the conduct of at least one of the defendants, and therefore plaintiff must bring all possible defendants before the court; and 3) the plaintiff must be unable to identify which defendant caused the injury. See Abel v. Eli Lilly & Co., 343 N.W.2d 164, 173 (Mich. 1984). Alternative liability applies "only where it is proved that each of two or more actors has acted tortiously and that the harm has resulted from the conduct of some one of them. On these issues the plaintiff

16

has still the burden of proof." Restatement (Second) of Torts, S 433B(3), cmt. g.

The Turnpike argues for the application of alternative liability to both the New Jersey Spill Act claim and its CERCLA claims. While New Jersey courts have not recognized wide-ranging alternative liability or other collective liability theories, see Shackil, 561 A.2d at 520; cf. James v. Bessemer Processing Co., Inc., 714 A.2d 898, 908-10 (N.J. 1998) (discussing difficulties of proving medical causation in toxic tort cases, and the caution New Jersey courts have utilized in analyzing novel models of causation), they have not been entirely hostile to alternative liability-based approaches. In rejecting the application of market share liability to injuries caused by vaccines, the Shackil court indicated that it would not be averse to recognizing market share liability in other factual situations, "perhaps one where its application would be consistent with public policy and where no other remedy would be available." 561 A.2d at 529. We do believe it is clear that the New Jersey courts have recognized that the burden shifting of an alternative liability theory does not eliminate the requirement that a plaintiff establish some "reasonable connection" between a defendant and the ultimate harm that a plaintiff suffers, and that all culpable actors be joined as defendants. See id. at 516, 520-21; see also Estate of Chin v. St. Barnabas Medical Center , Nos. A-11/12, 1999 WL 543286 (N.J. July 28, 1999) (stating that plaintiff seeking to shift burden of proof in medical malpractice case must demonstrate that: 1) plaintiff is blameless; 2) the injury bespeaks negligence on the part of one or more of the defendants; 3) all potential defendants must be before the court).14

The applicability of alternative liability in the context of federal environmental statutes has been food for scholarly thought rather than the subject of judicial opinion. See,

_____

14. As the Shackil court recognized, the requirement that all potential defendants be joined for alternative liability to apply has been relaxed in "market share" products liability cases, where a plaintiff need only join a "substantial share" of the defendants who might have produced or supplied the product in question. See 561 A.2d at 516-17.

17

e.g., John Copeland Nagle, CERCLA, Causation, and
Responsibility, 78 Minn. L. Rev. 1493 (June 1994); John W.
Mill, Agricultural Chemical Contamination of Ground Water:
An Econ. Analysis of Alternative Liability Rules, 1991 U. Ill.
L. Rev. 1135 (1991); Thomas C.L. Roberts, Allocation of
Liability Under CERCLA: A "Carrot and Stick" Formula, 14
Ecology L.Q. 601, 616-23 (1987); Ora Fred Harris, Jr., Toxic
Tort Litigation and the Causation Elements, Is there any
Hope of Reconciliation?, 40 Sw. L.J. 909, 913 (1986); James
M. Olson, Essay, Shifting the Burden of Proof: How the
Common Law Can Safeguard Nature and Promote an Earth
Ethic, 20 Envtl. L. 891 (1990); see also Developments in the
Law -- Toxic Waste Litigation, Liability Issues in CERCLA
Cleanup Actions, 99 Harv. L. Rev. 1511, 1520-33 (May
1986); Paul J. Dickman, Student Article, Leaking
Underground Storage Tanks: The Scope of Regulatory
Burdens & Potential Remedies under RCRA and CERCLA ,
21 N. Ky. L. Rev. 619 (Spring 1994); Melinda H. Van der
Reis, Comment, An Amendment for the Environment:
Alternative Liability and the Resource Conservation and
Recovery Act, 34 Santa Clara L. Rev. 1269 (1994). However,
a few courts have recognized the applicability of alternative
liability theories under the Resource Conservation and
Recovery Act, or RCRA. See, e.g., Aurora National Bank v.
Tri Star Marketing, 990 F. Supp. 1020 (N.D. Ill. 1998);
Zands v. Nelson, 797 F. Supp. 805, 812-13 (S.D. Cal. 1992).[15]

The applicability of alternative liability to a CERCLA
action has not been specifically addressed in federal case

_____

15. The Zands court set forth the following rule for alternative liability
in
its particular case: 1) where plaintiff identifies a period of time during
which contamination occurred; 2) where owners of the property or
operators of a gas station are strictly liable for the contamination of
the
property that occurred during their period of ownership or operation; 3)
where plaintiff joins as defendants all persons who owned the property
or operated the gas station for at least a portion of the time during
which
the contamination occurred; 4) but where plaintiff cannot prove which
owner or operator "caused" the contamination because more than one
person owned the property and operated the gas station during the
period of known contamination; 5) the Court will shift the burden to
each of the owner/operator defendants to show the contamination did
not occur during the period of the defendant's ownership or operation.
See 797 F. Supp. at 817-18.

18

law, and we will not decide the issue here, because we find that the Turnpike has not produced sufficient evidence to survive summary judgment, even if alternative liability were to apply. In so stating, we do not reject the concept of alternative liability in the context of these statutes out of hand; rather, we find that we have not been presented with a factual setting in which such a theory is tenable. The Turnpike has not met its initial burden of proving that the appellees have each directed their actions in such a manner toward the Turnpike sites at issue, such that the application of some form of an alternative liability theory would be appropriate.[16] The Turnpike urges that its highly circumstantial evidence is enough, but we conclude that it presents probabilities rather than proof. It is to this evidence that we now turn.

D. Evidence

The record reveals that COPR waste was found at the three appellees' chemical processing sites, and that the appellees made contracts with various trucking and hauling companies to remove the wastes. What is contested here is whether reliable evidence ties the COPR of the particular defendants to the seven Turnpike sites at issue in this case. The Turnpike relies upon NJDEP Directives, expert reports, and deposition testimony from other cases.[17] We note at the outset that the only evidence in all of the material supplied that even begins to link appellees with the sites in question

_____

16. Our concurring colleague would require that, under an alternative liability theory, plaintiff merely had to show that defendants generated this specific sort of hazardous waste in the relevant area. We do not subscribe to this statement of plaintiff's burden under our case law, which, as we have discussed, requires a "connection." Our colleague notes that in Summers v. Tice, only a showing of negligence was required; however, the factual connection there was clear -- both hunters were shooting in plaintiff's direction.

17. The Turnpike relied upon and argued the significance of the Administrative Consent Orders in the District Court, but they neither rely upon nor cite to these orders on appeal. See Nagle v. Alspach, 8 F.3d 141, 143 (3d Cir. 1993); Lunderstadt v. Colafella, 885 F.2d 66, 78 (3d Cir. 1989).

19

is the depositions in previous cases, and they relate solely to sites 7 and 20.

We find the Directives and the proffered expert report to be of little probative value, because they contain no evidence regarding the responsibility of these appellees for COPR deposits at the sites in question. The Turnpike relies upon a collection of facts that could be summarized as "if it is there, it must be theirs." The Turnpike urges that the conceded large scale production of COPR by the appellees, the need for its local disposal, the proximity of the appellees' production facilities to the sites at issue, and the use of this material as fill over the years, combine to create a question of material fact as to whether these appellees bear responsibility and must pay contributions to the Turnpike for depositing COPR at the sites in question. For example, the Turnpike argues that since sites 56, 131, and 201 are close to Occidental's former processing plant, it is liable for those sites, and since site 21 is close to PPG's plant, PPG should be held accountable for the COPR contamination there.[18] Although these facts might serve as corroboration if there were other proofs of the actual involvement of the appellees with disposal at the sites in question, they provide no proof whatsoever that they did in fact dispose of their COPR at the sites in question. The expert report commissioned by the Turnpike from Louis

_____

18. Site 192 is close to an Occidental facility in Newark, but it is not clear from the record that this particular facility even produced COPR. As for the other sites located in Kearny for which the Turnpike seeks to hold Occidental accountable, namely, 56, 131, and 201, an internal memo by Occidental concedes that chrome in properties surrounding the plant in Kearny is probably a result of scattering ore and from the fact that "for many years chrome wastes were dumped indiscriminately on our own property and anywhere else that seemed to be a likely spot. . . . [b]eginning July 17, 1965, the mud trucking contract was awarded to Disch, who sold the mud for fill in both highway and building construction." A. at 917a. While there is some evidence that Disch sold to highway construction projects, nothing in the record links Occidental to the Turnpike via Disch. Although Disch was deposed in Route 440 Vehicle Corp. d/b/a Bob Ciasulli Acura v. James G. Nicholas, et al., No. 86-5064 (D.N.J.), only one page of that testimony is proffered as part of the record before us, and it reveals nothing about where Disch distributed or sold the waste.

20

Berger and Associates is even less helpful, since it paints a generalized contamination scenario at the Turnpike locations, again lacking in a link to one or more of the appellees, and also lacking in certainty as to the precise nature of the contamination. The report indicates that sources other than COPR-contaminated constructionfill might be at work at some of the sites in question, and it draws no conclusions as to which appellee is accountable for the contamination at a particular site.19

We also note that, notwithstanding the urgings of the Turnpike to the contrary, we are not convinced that even if probative, the Directives would constitute admissible evidence. Rule 803(8)(C) provides for admissibility in civil actions of "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." The Turnpike contends that the Directives are the result of a government investigation and

_____

19. Site 7: The report states that it could not provide conclusive information "to determine whether the chromiumfill was present at the site" prior to or during turnpike construction. A. at 385a. Also, the report indicates that the chromium present could be the result of railroad beds north of the site, and that in general, it was difficult to know what activity was most likely to have caused the transportation of chromium fill to the site. A. at 408a.

Site 20: The major historical land uses identified at this site were railway and roadway transportation. A. at 385a. Thefill used could be due to either the Turnpike construction or the railroad embankments on this site, or to the presence of a lumber yard in this area or other construction. A. at 419a, 445a-46.

Site 21: The report notes that chromium fill might have been present prior to the Turnpike construction, as part of a railroad embankment traverses this site. A. at 385a, 429a, 446a.

Site 56: The report concludes that chromiumfill was most likely transported to the site for the Turnpike authority subsequent to the actual roadway construction work. A. at 385a, 446a.

Site 131: The report concludes that it does not appear that the Turnpike construction was involved in the transportation of fill to this location, although chromium may have been brought to the site via the maintenance or creation of an access road at this site. A. at 385a, 446a.

21

are therefore admissible. Appellees challenge the Directives as nothing more than a form of notice pleading used to serve notice of potential liability for costs of clean up, and, although the factual findings set forth within the Directives are presumably the result of the NJDEP's own investigations, appellees urge that they are not the result of an adversarial process. See, e.g., Kimber, 539 A.2d at 1185. We think that the appellees have the better argument and the findings contained in the Directives have not been shown to be admissible as evidence.20

The Turnpike also relies on deposition testimony from other litigation as evidence of a link between the sites and the appellees but, as noted above, this testimony is helpful -- if at all -- only as to sites 7 and 20. The Turnpike explains that it has had access to depositions from a range of prior cases involving appellees and has produced excerpts from some of these cases in the record before us, but in support of its arguments as to sites 7 and 20, it relies primarily on excerpts from depositions taken in the Hudson County case of Exxon v. PPG Indus., et al.

The Turnpike offers these depositions, contending that they are probative and admissible. We have our doubts regarding their admissibility and we disagree with the Turnpike's view of their value as evidence. In order for former testimony to be admissible under Rule 804(b)(1): 1) the declarant must be unavailable; 2) testimony must be taken at a hearing, deposition, or civil action or proceeding;

_____

20. 803(8)(C) does not preclude the introduction of opinions and conclusions in such reports so long as: 1) all statements in such a report must be based on factual investigation; 2) any portion of the report that is admitted must be sufficiently trustworthy. See In re Complaint of Nautilus Motor Tanker Co., Ltd., 85 F.3d 105, 112 (3d Cir. 1996) (citing Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169 (1988); Clark v. Clabaugh, 20 F.3d 1290, 1294 (3d Cir. 1994)). Four non-exhaustive factors may be considered in determining whether a report is sufficiently trustworthy: 1) the timeliness of the investigation; 2) the investigator's skill and experience; 3) whether a hearing was held; and 4) possible bias when reports are prepared with a view to possible litigation. See 85 F.3d at 112. The party opposing the introduction of a public report bears the "burden of coming forward with enough negative factors to persuade a court that a report should not be admitted." See id. at 113.

22

and 3) the party against whom the testimony is now offered must have had, or its predecessor in interest must have had, an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. See Kirk v. Raymark Indus., Inc., 61 F.3d 147, 165 (3d Cir. 1995).[21] The Turnpike has not even attempted to satisfy thefirst or third requirement regarding the admissibility of the depositions in this proceeding, and given the paucity of information in the record before us as to the whereabouts of these witnesses and the nature of the prior proceeding, it is impossible for us to determine on our own that these depositions are admissible. We do not rely solely on this concern in assessing the import of this evidence, however, because we view the testimony itself as so unreliable and imprecise that it does not constitute evidence sufficient to create a genuine issue of material fact to withstand appellees' summary judgment motion, or to prove the Turnpike's own summary judgment motion.

1. Evidence at Site 7 and its Connection with Allied's COPR Production

The Turnpike points to testimony given by John Lesofski in the Exxon case that he had obtained chrome fill from a Reppenhagen, Inc. from the Allied facility and delivered it to a large-scale sewer construction project in Jersey City, where he witnessed backfilling of the pipeline. Giving the Turnpike the benefit of reasonable inferences from their assertions, the conclusion we can draw is that Lesofski witnessed the backfill of the pipeline.[22] Because there appear to be at least 16 sites in the pipeline vicinity, his testimony does not establish that Allied's fill went to Site 7.

_____

21. Privity or a common property interest is not required to establish a predecessor in interest relationship, rather, a shared interest in the material facts and outcome of the case will create such an interest. See Lloyd v. American Export Lines, Inc., 580 F.2d 1179, 1185-87 (3d Cir. 1978).

22. In addition, the evidence of Lesofski's testimony that has been supplied in the record is not his deposition, but, rather a reference to that testimony in one of the NJDEP Directives.

In the Exxon case, a trucker, Michael Pitsinos, testified that he hauled fill material for Allied, and that he delivered to the areas where sewage pipeline was being put down in Jersey City. Site 7 is within the area considered to be a Jersey City sewerage construction project. However, this site does not consist of the entire sewerage project. Further, it is not entirely clear that the material Pitsinos transported was chrome: he described the material as "black sand, dirty sand." which he contrasted with the "gray chrome" at another site, which is referred to as the "Route 440" site. A. at 1010a–18a. At no point did Pitsinos testify that he hauled this material to a Turnpike site as part of a construction project. At best, he testified that he remembered bringing a load of "fill" –- what kind or its origins are not clear –- to the Turnpike on behalf of Laffera Construction and that he got stuck in the mud. A. at 1018a.23

2. Site 20 and Connection with PPG COPR Production

The Turnpike also points to other depositions from the Exxon case to prove that PPG is accountable for the COPR contamination at this site and indicates that the following serves as evidence linking PPG to the COPR found at Site 20:

1. The Turnpike refers to the testimony of Richard J. Samuelson, discussing the movement of residue and mud off of the PPG property. However, the deposition testimony is hearsay, if not double hearsay, for his knowledge is based upon a statement by a Robert Widing, who testified in another case that his knowledge was based upon a statement made to him by a PPG agent, Worth Franklin. A. at 1023–24, 1026, 1033.

_____

23. There is a letter in the record from Allied's Director of Environmental
Services to the NJDEP indicating that a site other than those involved in this litigation was used for fill, but that neither the "make-up nor the amount of the fill that was used" were known. A. at 887a. The letter also indicates that New Jersey Highway Department may have used "the material" for fill in the construction of the Turnpike. Id. Even if this letter
could be construed as reliable evidence, the letter does not acknowledge that the material to which it refers is COPR waste nor that it was deposited at any of the sites involved in this litigation. A. at 1311a–12a.

2. Richard Kordulak, who testified in his deposition from the Exxon case that the PPG material was "distributed all over the Caven Point area" and that chromium waste was taken to the "Turnpike area, underneath the turnpike at the end of Caven Point Avenue." A. at 1044a. However, Kordulak's testimony also notes that the time period when he witnessed four individuals receiving chromium waste from the PPG site was from the late 1960s to the early 1980s, after PPG had closed its Garfield Avenue facility and sold it to others, when the piles of COPR at the site were gone. A. at 10sa–11sa. In other words, this testimony is relevant to a time period after the events that the Turnpike alleges caused the contamination at Site 20. A. at 972–73a.24

3. Testimony by Zygmunt Wozniak in the Exxon case indicates that materials were moved from the PPG plant to the Turnpike for construction, and that the dump trucks returned to the site quickly. A. at 1040–41. However, PPG has provided further deposition testimony indicating that Wozniak never had any conversations at all with the persons who actually transported the material; that he was not certain that the trucks he saw at the Turnpike were the same as the trucks he saw at the PPG plant; that he did not recognize any of the people driving the dump trucks to the Turnpike; and that some of the COPR fill used at the Turnpike came from somewhere other than the PPG plant and that at least some of his knowledge was based on hearsay. A. at 4sa–10a.

Even giving the Turnpike the benefit of all reasonable inferences from these evidentiary proffers, the testimony is

_____

24. In a footnote in its reply brief, the Turnpike says that "Kordulak testified, in no uncertain terms, that PPG's waste was delivered to Site 20 both during and after the time the PPG facilities was in operation and that PPG's COPR remained on site as late as 1981. See also Jersey City Redevelopment Authority v. PPG Indus., 65 F. Supp. 1257 (D.N.J. 1987) (finding that PPG's COPR was being taken from the Garfield Avenue facility in 1975)." The Turnpike notes that, "This testimony is in portions of the transcript not provided to the Court by PPG." It then states, "We would be pleased, if requested, to provide the Court with the entire transcripts of Kordulak's and Wozniak's depositions." We note that this evidence is not in the record before and it is not for the court to request
the parties to augment their proof.

25

deficient in several respects: it is vague and imprecise, of questionable reliability, and therefore not sufficiently probative to create an issue for trial. See Anderson v. Liberty Lobby, 477 U.S. 242, 249–50 (1986) (stating that summary judgment may be granted if evidence is "merely colorable" or is "not significantly probative"); Blackburn v. United Parcel Service, 179 F.3d 81, 95 (3d Cir. 1999) (citing Philbin v. Trans Union Corp., 101 F.3d 957, 961 n.1 (3d Cir. 1996)) (noting that a hearsay statement that is not capable of being admitted at trial should not be considered at summary judgment stage); Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994). In sum, we find that the evidence produced by the Turnpike is insufficient to prove the nexus required for the Turnpike to recover from the appellees under either CERCLA or the Spill Act, nor is this evidence sufficient to show that each of these appellees acted in a tortious manner within the meaning of these statutes toward these sites such that an alternative liability theory would be appropriate.

We note, further, that we also concur with the District Court's conclusion that the Turnpike may not be the innocent plaintiff that in fairness should be permitted to take advantage of alternative liability. As the District Court noted, the Turnpike is a PRP in this case, and a joint tortfeasor; as such, it may very well be inappropriate to utilize an alternative liability theory, which is meant to apply to wholly innocent plaintiffs, to shift the burden of proof to its fellow tortfeasors in a contribution action.

We also note that the Turnpike clearly did not do all that it could to prove causation such that a burden shifting approach should be utilized in this matter.25 The Turnpike's

_____

25. As the District Court noted:

     Unlike in the traditional alternative liability scenario, the lack of
     proof of causation here is not due to the Defendant' conduct. In fact,
     [the Turnpike] is in a better position than the Defendants to
     ascertain the source of the COPR at each site, because [the
     Turnpike] is the present owner and operator of all seven sites and
     was the entity that contracted to receive the COPR that is the source
     of the contamination. See Blanks v. Murphy, 632 A.2d 1264 (App.
     Div. 1993) (rejecting burden shifting because plaintiff was in a better
     position to determine the cause of its injury).

16 F. Supp.2d at 471.

lack of diligence clearly militates against a finding that alternative liability should be applied here. The Turnpike was made aware of the presence of COPR at some of the sites at issue in 1984, yet did not file suit in this matter until 1993, and the process of its fact finding in this case has been less than impressive. A. at 271a. Cf. Larton v. Blue Giant Equip. of Canada, Ltd., 599 F. Supp. 93, 95 (E.D. Pa. 1984) (declining to apply alternative liability theory, in part because it was not apparent that plaintiff could not identify the manufacturer through the exercise of reasonable diligence); Abel, 343 N.W.2d at 173 (stating that plaintiffs must "make a genuine attempt to identify the tortfeasor responsible for the individual injury," and a finding of a lack of diligence would preclude utilization of alternative liability theory in future DES cases); Bixler v. Avondale Mills, 405 N.W.2d 428, 431 (Minn. Ct. App. 1987) (finding eleven year delay before filing suit made court reluctant to adopt alternative liability theory).

The Turnpike has, quite simply, not done enough. The Turnpike has, instead, asked us to rewrite the burdens that a litigant must meet under the CERCLA and the Spill Act, and the burden placed upon a plaintiff when alternative liability is applicable, to make up for the shortcomings in its proof. We will not do so. We will affirm the order of the District Court.

E. Supplemental Jurisdiction

The Turnpike maintains for the first time on appeal that the District Court should not have supplemental jurisdiction over its state law claims, due to their complexity. See 28 U.S.C. S 1367(c)(1). A district court's decision to determine such claims is discretionary, and where a party has failed to object to the district court's exercise of this jurisdiction, in the absence of special circumstances, the challenge is waived. See, e.g., Int'l College of Surgeons v. City of Chicago, 153 F.3d 356, 366 (7th Cir. 1998); Doe by Fein v. District of Columbia, 93 F.3d 861, 871 (D.C. Cir. 1996). We find no exceptional circumstances in this case, and hold that the Turnpike has waived its objections to the District Court's exercise of supplemental jurisdiction in this matter.

27

For the foregoing reasons, we will affirm the judgment of the District Court.

BECKER, Chief Judge, Concurring.

I agree with the Court that the Turnpike failed to exercise diligence in discovering evidence as to who shipped what COPR to the various sites. However, I would ground the affirmance of the summary judgment on this factor alone. In my view, the Court's insistence that, in order to fulfill CERCLA's causation requirements, the Turnpike "must offer some proof that Allied, PPG, and Occidental deposited, or caused the disposal of, COPR at each of the sites at the issue in this case," is too strict a test under the governing law of alternate liability.

I believe that the threshold requisites for alternate liability are as follows. First, the plaintiff has to show that it would be entitled to recover if it established causation. In strict liability cases, this would require only a showing of actionable harm. Second, the plaintiff should show that each defendant did the thing that exposed it to liability. In Summers v. Tice, both defendants were negligent. See 199 P.2d 1, 2 (Cal. 1948). By way of analogy, in CERCLA, the requisite action would be generating the relevant kind of hazardous waste in the relevant area regardless of fault. Third, the plaintiff must join all the defendants who might be responsible for the harm, so that it would be clear that at least one of the defendants actually did cause the harm. See Zands v. Nelson, 797 F. Supp. 805, 813 (S.D. Cal. 1992); Aurora Nat'l Bank v. Tri Star Marketing, Inc., 990 F. Supp. 1020, 1031 (N.D. Ill. 1998).

I believe that the Turnpike's evidence may be sufficient to meet this threshold test for the following reasons: (1) the defendants produced large quantities of COPR; (2) no one else produced COPR within 150 miles of Hudson County; (3) the practice was to dispose of COPR locally; (4) the defendants freely and indiscriminately disposed of COPR in and around Hudson County; (5) the defendants' COPR was used in various construction and development projects; (6) the Turnpike was building the Turnpike and buyingfill material at the same time as the defendants were disposing of COPR as fill; (7) the defendants understood that COPR was being used as fill in highway projects; (8) the seven sites are in close proximity to the defendants' facilities. I would nonetheless affirm the judgment because I believe

29

that, in addition to the requirements set forth above, alternate liability doctrine demands that the plaintiff exercise diligence in determining the identity of the other responsible parties, yet the Turnpike failed to do so.

I also take issue with the statement of the court that the alternate liability theory is meant to apply to wholly innocent plaintiffs. Consider the seminal alternate liability case, Summers v. Tice, 199 P.2d 1 (Cal. 1948) The plaintiff, after telling the defendants, with whom he was hunting quail on an open range, that they all should remain in a line, went up a hill and thus put himself at the tip of a triangle the base of which was formed by the other hunters. The plaintiff was in this position when he was shot. Despite being far from an innocent plaintiff, he was able to recover. See id. at 1. This result belies the Court's contention. Moreover, a contributorily negligent plaintiff could surely recover in a S 402(A) case where contributory negligence is not a defense, and yet alternate liability applies.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit