**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3144-17

SANDRA DORRELL and
SANDRA DORRELL t/a OLD
ALLOWAY MERCHANDISE,

      Plaintiffs-Appellants/
      Cross-Respondents,

v.

WOODRUFF ENERGY, INC.,

      Defendant-Respondent,

and

GULF OIL LIMITED
PARTNERSHIP and CHEVRON
U.S.A.,

      Defendants-Respondents/
      Cross-Appellants,

and

HARLEYSVILLE GROUP, INC.,
HARLEYSVILLE INSURANCE
COMPANY, and FARMERS
MUTUAL FIRE INSURANCE

CO. OF SALEM COUNTY,

     Defendants.

_____

Argued January 27, 2020 – Decided March 11, 2021

Before Judges Messano, Ostrer and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Salem County, Docket No. L-0343-11.

Louis Giansante argued the cause for appellants/cross-respondents (Giansante & Associates, LLC, attorneys; Louis Giansante, of counsel and on the briefs).

Matthew S. Slowinski argued the cause for respondent/cross-appellant Chevron U.S.A. Inc. as successor to Gulf Oil Limited Partnership (Slowinski Atkins, LLP, attorneys; Matthew S. Slowinski, on the briefs).

Mitchell H. Kizner argued the cause for respondent Woodruff Energy, Inc. (Flaster Greenberg, PC, attorneys; Mitchell H. Kizner, on the brief).

Cristina Stummer argued the cause for amicus curiae The Fuel Merchants Association of New Jersey (Saul Ewing Arnstein & Lehr LLP, attorneys; M. Paige Berry, Cristina Stummer and Ryan L. DiClemente, of counsel and on the brief).

    The opinion of the court was delivered by

OSTRER, J.A.D.

This case, which returns to us after our remand and a bench trial, involves claims for private contribution under the New Jersey Spill Compensation and Control Act (Spill Act or Act), N.J.S.A. 58:10-23.11 to -23.11z.[1]  Plaintiff Sandra Dorrell once operated a general store on a property she has owned since 1984 in Alloway Township.  In preparing to sell her property, she learned that petroleum products had contaminated the soil and groundwater. It was undisputed that kerosene or fuel oil was present.  However, according to one plaintiff's expert, gasoline was present, too.  Dorrell claimed defendants Woodruff Energy, Inc. and Chevron U.S.A. Inc. (improperly named Chevron Corp.) were persons "in any way responsible for [the] . . . hazardous substance" found on her property and were "strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs."  N.J.S.A. 58:10-23.11g(c)(1).

Woodruff regularly delivered fuel oil to a 1000-gallon above-ground storage tank (AST) in the store's dirt-floored basement.  Sometime in the 1990s, gallons of oil spilled onto the dirt floor.  Despite clean-up efforts, oil evidently seeped into the ground.  The court found that Woodruff did not own or control the tank, nor did Woodruff over-fill the tank as Dorrell alleged.  The spill

_____

[1]  We previously reversed the trial's court grant of summary judgment dismissal on statute of limitations grounds. <u>Dorrell v. Woodruff Energy</u>, No. A-3585-13 (App. Div. Sep. 30, 2015).

evidently resulted from a tank rupture. And there was an insufficient nexus between Woodruff and the spill to find that Woodruff was a person "in any way responsible" for the oil in the ground.

In appealing the no-cause verdict on her claim against Woodruff, Dorrell contends the court misapplied the Spill Act by requiring her to show Woodruff was at fault for the tank spill. She contends that Woodruff, by delivering the fuel oil that spilled, was a party in any way responsible for the contamination. With the support of amicus, Fuel Merchants Association, Woodruff argues that its sale was not sufficient to trigger responsibility under the Spill Act. We agree, and affirm the court's verdict dismissing Dorrell's claims against Woodruff.

Woodruff was not the only firm that delivered petroleum products to Dorrell's property. For many years, long before Dorrell owned the general store, the store sold gasoline from curbside pumps, and kerosene from inside the store. Dorrell alleged that Chevron's predecessor, Gulf Oil Corp., delivered gasoline to three underground storage tanks (USTs), including a 1000-gallon tank that Gulf installed in the late 1950s and then abandoned, and two older 550-gallon tanks that were removed. Dorrell alleged that Gulf also delivered kerosene to

4

the AST that later failed.[2] After the 1950s, Gulf ceased its deliveries, and Woodruff took its place. Gasoline sales evidently stopped altogether in the early 1960s after the store's previous owner died.

The trial court held that neither Chevron nor Woodruff were liable for any fuel oil or kerosene contamination. However, the court held that Chevron was likely the owner and responsible party for the 1000-gallon UST, and it likely once contained gasoline, which it discharged into the ground. Therefore, the court held that Chevron was liable under the Spill Act to investigate the tank, and if it confirmed that the tank once contained gasoline, then Chevron would be "responsible . . . for discharges and to remediate, if necessary under the applicable regulations, the gasoline contamination" on and off the site. But, if Chevron could demonstrate, after a remedial investigation, that the tank did not contain gasoline, its "responsibility would end." After the trial judge retired, another judge denied Chevron's motion for a judgment notwithstanding the verdict, or a new trial.

Chevron cross-appeals on several grounds. It contends there was no competent evidence of gasoline in the ground or groundwater; and the court

---

[2] Thus, two 1000-gallon tanks are involved in this case: an AST in the basement that was removed in the 1990s; and a UST extant beneath the sidewalk.

relied on the net opinion of an expert unqualified to identify petroleum contaminants, or to opine about causation of contamination. Chevron also contends it is not liable because it does not own the 1000-gallon UST. We are constrained to agree that the trial court never found Hopkins qualified to render the opinions he offered at trial, nor did he demonstrate that his methodology was reliable. We therefore remand for a finding on the admissibility of his opinion.

I.

It is unchallenged on appeal that Dorrell's property is contaminated with fuel oil or kerosene from the failure of the basement AST. Experts for Dorrell, Woodruff, and Chevron all chemically analyzed samples drawn from soil borings and wells near the tank, and north of it, in the direction that groundwater flowed. A hydrocarbon fingerprinting expert for Dorrell, Bruce Torkelson, identified the contaminant as a "weathered m[iddle] distillate" which was "19 [years old] plus or minus two years." Torkelson said it was probably kerosene, but fuel oil was also a middle distillate; gasoline was not. Woodruff's expert in contaminant identification and age dating, William Silverstein, P.E., agreed with Torkelson's opinion that the soil and water samples contained kerosene. Chevron's sole witness, Dr. Joseph Lifrieri, was qualified as an expert in geological environmental engineering, fingerprinting, and age dating. Dr.

Lifrieri concluded the samples showed a "fuel oil, diesel-type of contamination" of the site.

It is also undisputed on appeal that Dorrell owned the 1000-gallon AST that leaked petroleum product onto the ground. After Dorrell and her late husband purchased the property, they installed an oil-fed furnace (replacing a coal-fed one) and utilized the pre-existing 1000-gallon tank for the fuel oil, which they purchased from Woodruff. In the mid-1990s, Dorrell installed a new 275-gallon fuel-oil AST. Woodruff was not responsible for maintaining either tank.[3]

The genuine factual controversy on appeal pertains to the court's finding that Dorrell's property was also contaminated with gasoline from the 1000-gallon UST. The trial court relied on Dorrell's sole expert witness on gasoline contamination — Craig Hopkins, a licensed site remediation professional who holds a bachelor's degree in Earth Sciences.

_____

[3] A significant part of trial testimony pertained to Dorrell's claim that contamination also came from Woodruff's overfilling the 275-gallon tank that she installed to replace the old tank in the late 1990s. Woodruff denied the over-fill allegation, and presented evidence that it never employed the two persons Dorrell identified by name as being involved in the alleged overfill and its cleanup. A Woodruff witness testified instead that Dorrell called Woodruff for help after she discovered a pool of oil in her basement, which emanated from a failure of the 1000-gallon tank. On appeal, Dorrell does not challenge the court's fact-finding that the basement spill resulted from the rupture and not an overfill.

Unlike the other experts who testified, Hopkins was not qualified to identify petroleum products based on chromatographic studies or hydrocarbon fingerprinting. He held a degree in earth science. He was a licensed site remediation professional (LSRP). See N.J.S.A. 58:10C-1 to -29. He had been involved in as many as 1000 site investigations, most involving petroleum hydrocarbons. However, he had never testified as an expert.

He admitted he was not an expert in age dating. He also admitted that he "sent out samples to determine the type of contaminant" because that was not his "expertise." He relied on laboratories to identify contaminants. He also stated he had never testified about the cause of a release.

Dorrell's counsel offered Hopkins "as an expert in subsurface investigation, particularly of petroleum hydrocarbons." Counsel explained that would include identifying contaminants and their source. He asserted that LSRPs typically determine whether contamination originated on or off site.

The court qualified Hopkins as an expert in investigating subsurface conditions. But, responding to Chevron's motion in limine, the court held Hopkins was not qualified to identify a specific contaminant, because he "indicated that he can't identify the specific contaminant . . . [and] has to send that out for testing." Also, absent "more foundation," the court withheld

qualifying him as an expert on proximate cause, although the court left open the possibility he could be qualified later.  But, the court did not expressly revisit the issue of Hopkins's qualifications to opine about causation.

Nonetheless, over Chevron's objection, the court permitted Hopkins to opine, based on what amounted to circumstantial evidence, that gasoline was present on the site, gasoline contamination was caused by discharges from the UST, and the UST was installed by Gulf.

In reaching his opinion, Hopkins relied in part on his understanding of how the prior owners used the property, and where they located gasoline dispensers, pumps, and USTs.  Hopkins based that understanding in part on documents and contracts between Gulf and the prior owner, which Dorrell found in the store's basement; on multiple historic maps; and on his surveys of the present site, including technology to locate USTs.  He also relied on his interpretation of chemical analyses of samples from wells and soil-borings, although none of those analyses included opinions that the samples contained gasoline.[4]

---

[4]  The historic maps were "Sanborn maps."  The Sanborn Map Company prepared detailed maps of municipalities for use by fire insurers.  As gasoline USTs would be a hazard of interest to fire insurers, Sanborn usually noted them on its maps.  One witness testified the same was not true of fuel oil USTs.

The site is located on the northwest corner of West Main Street, running east-west, and Greenwich Street, running north-south. Hopkins stated that the old general store sold gasoline from two curbside dispensers in front of the store, along West Main Street. Two underground tanks were once located on the same side of the property, near the dispensers. An old lease between Gulf and the prior owner referred to two 550-gallon USTs and pumps. Sales receipts referred to Gulf's delivery of two brands of gasoline. Hopkins concluded the two 550-gallon USTs and pumps were later removed, as his survey could not locate them, but they were not removed at the same time. There was also no sign of the above-ground dispensers, which Dorrell said did not exist when she purchased the property.

But, Hopkins's survey located a 1000-gallon UST under the sidewalk along Greenwich Street, on the east side of the property. He also located underground piping connecting the tank to the house, as opposed to the area of the old dispensers. Yet, Hopkins ultimately opined that the large UST stored gasoline. He relied in part on a 1958 contract in which Gulf agreed to install and lease to the prior owner a 1080-gallon UST. That was around the same time that a document referred to one of the 550-gallon tanks as "leaky." He concluded that the referenced 1080-gallon tank must be the 1000-gallon tank he located

10

along Greenwich Street.  A 1955 agreement between Gulf and the store's prior operator included a hand-written notation, "1 - 1000 gal Tank - installed 1958" among the list of equipment that Gulf loaned and installed on the premises.[5]

Chevron's expert, Lifrieri, opined that the piping indicated that the tank did not store gasoline; rather, it stored a petroleum product that was either used or sold inside the store.  Besides, Lifrieri stated, if the tank were intended for gasoline, it would have been located much closer to the dispensers on West Main Street.  Noting that a relatively new 1080-gallon tank retained significant value, Lifrieri suggested that Gulf installed its 1080-gallon UST close to the dispensers, and then removed it after the store ceased gasoline sales in the early 1960s.

Evidently, a 1959 Sanborn map did not indicate there was a 1000-gallon tank along Greenwich Street.  At trial, Hopkins acknowledged that he explained

---

[5] The 1955 agreement between Gulf and the store's prior owner governed the retail sale of petroleum products and loaned and installed certain identified equipment, included "2 - 550 Gal. Tanks."  The form was pre-printed and included type-written inserts dating it and identifying the leased equipment.  The court ruled that the handwritten words, "One Leaking Tank Taken out" with an arrow pointing to the type-written entry "2- 550 Gal. Tanks" was inadmissible hearsay, and not admissible for the truth of the matter asserted; but the experts could rely on it.  However, the court found as fact that a 1000-gallon tank was installed in 1958.  Around 1958, the store turned from selling two brands of Gulf gasoline to one, resulting in the need for just one gasoline storage tank.

the omission in a pre-trial report by noting that Sanborn maps did not show private fuel oil tanks. In other words, Hopkins had previously inferred that the 1000-gallon UST was a fuel oil tank, not a gasoline tank.[6]

Although the court had previously barred Hopkins from identifying the particular petroleum product found on site, the court allowed him to opine that gasoline was found in soil and water samples just north of the Greenwich Street UST. Hopkins asserted that a forensic lab analysis of the sort performed on the samples near the AST and north of the building — where the experts identified the particular type of petroleum product based on analysis of chromatograms and other methodologies — was unnecessary when analyzing what he called "dissolved phase samples" — by which he meant, petroleum products that had dissolved in groundwater. Instead, Hopkins stated he could base his opinion on the constituent chemicals found in the samples, such as total lead and four other chemicals — benzene, toluene, ethyl benzene and xylene — known collectively

---

[6] The 1959 Sanborn map is not in the record before us. Therefore, we cannot ascertain if it included the 1080-gallon gasoline tank that Gulf evidently installed in 1958. And, neither party presented documentary evidence regarding the installation of the Greenwich Street UST. Particularly because the tank is located under the public sidewalk, public records conceivably may have referenced the tank's installation.

as BTEX. He said the four chemicals are "markers in a volatile run that's being done when you're targeting gasoline."

Chevron's counsel objected that Hopkins was not qualified to identify gasoline, and that BTEX is found in "all petroleum hydrocarbons." In particular, Lifrieri testified that fuel oil also contains BTEX.[7] Notwithstanding the court's earlier ruling, the court allowed Hopkins to offer his opinion, stating "I can reject it later if it turns out I shouldn't have it in evidence."

Based on the contamination near the 1000-gallon UST, Hopkins opined "there . . . was a release of petroleum hydrocarbons. There were some signatures in the analysis that could indicate fuel oil, could indicate[] gasoline, could indicate kerosene. The total lead indicated that it was likely that there was a leaded gasoline release." He stated that based on "all the results, the soil, the field readings, the soil results, the groundwater results, [and] the groundwater flow direction . . . that the source of the release is from . . . either one or both of the tanks that were present in the southeast corner of the property." He opined the release occurred sometime between the 1920s and the 1970s.

---

[7] He explained that gasoline would present differently from fuel oil in a chromatogram. However, no one analyzed chromatograms of the samples taken close to the 1000-gallon UST.

A-3144-17

Hopkins contended that lead concentrations increased "as you go across the site." The highest lead readings were found in test wells in the northern end of the property, beyond the north side of the building, but Hopkins asserted that the groundwater generally flowed in the direction of that well.[8] He also noted that a test well near the northwest corner of the 1000-gallon UST had elevated concentrations of volatile, tentatively identified compounds (TICs), total alkanes, and total lead. Hopkins stated that his conclusion was also supported by field readings he took near the UST. The results of his soil borings and field tests led him to rule out "a near surface release," such as from the dispensers.

Hopkins acknowledged that samples from the test well along the curb on West Main Street, near where gasoline was once dispensed, did not indicate elevated levels of lead. That finding, he opined, indicated that the contamination on the site did not come from off-site sources to the south.[9] Samples from soil borings near the old 550-gallon tanks were also below regulatory standards or

---

[8] However, the forensic lab that fingerprinted a sample from that test well opined that the contaminant was weathered diesel fuel, not gasoline.

[9] Samples from another test well about forty feet to the west and near the southern property line had lead readings almost as high as those near the 1000-gallon UST.

non-detectable.  Over objection, Hopkins asserted that contaminated soil may have been removed along with the tanks, which would explain the low readings.

Hopkins also conceded that he did not "actually know" what was stored in the Greenwich Street UST; he never inspected the tank and had no evidence of any holes or leaks.  He also conceded that "total lead" is a common metal found in soil and groundwater; "organic lead" by contrast is the type of lead found in old leaded gasoline; yet, Hopkins did not test for organic lead.  Hopkins asked a forensic lab to search for multiple components of leaded gasoline when testing samples from the north side of the building — which turned out to be negative for gasoline — but did not request such testing of the samples near the alleged gasoline tank.[10]  Hopkins also acknowledged that soil borings next to the test

---

[10] In particular, an expert for plaintiff, Alan Jeffrey, Ph.D., testified in a de bene esse deposition introduced at trial that someone searching for leaded gasoline would test for six compounds found in "certain leaded gasolines" — tetramethyl lead (TML), trimethylethyl lead (TMEL), dimethyldiethyl lead (DMDEL), methyltriethyl lead (MTEL), tetraethyl lead (TEL), and methylcyclopentadienyl manganese tricarbonyl (MMK).  In particular, TEL was used as an anti-knock agent in leaded gasoline before 1960.  Jeffrey testified that Pace tested for the six chemicals in the samples from the AST and from a well on the north of the property and concluded no gasoline was present.  He was not asked to perform similar tests of samples taken closest to the Greenwich Street UST.  The trial court ultimately barred Jeffrey's ultimate identification that the petroleum product in the samples he analyzed was weathered diesel— because he provided insufficient explanation.  However, the court did not bar Jeffrey's general comments on the chemicals identified with leaded gasoline.

well near the northwest corner of the Greenwich Street UST showed no lead or BTEX levels above regulatory standards.

Woodruff's and Chevron's counsel repeatedly objected to Hopkins's qualifications to opine as to the cause of the contamination. Dorrell's counsel responded that Dorrell was not obliged to prove that the gasoline "came from the tank versus the appurtenances" so long as he opined that it came from the "closed system" including the tank, the pump, the dispenser, or human spills. Defense counsel insisted that Hopkins was not qualified to render even that opinion. The court allowed Hopkins to offer his opinion, stating he would "figure out" later if Hopkins had "the qualification to be able to say it's Gulf."

II.

Over four separate days, the trial judge orally reviewed the testimony and provided his findings of fact and conclusions of law on the record. The court found that a 1955 agreement between Gulf and the old store operator, established that Gulf owned the two 550-gallon tanks; they did not become part of the real estate; and the operator was obliged to maintain them. A handwritten addendum indicated a "leaky tank" was removed, and a 1,000-gallon tank installed in its place in 1958. The court found that the second 550-gallon tank was also removed, but the date was uncertain.

16

Based on the various sales documents, the court found that the two 550-gallon tanks stored two different brands of gasoline, not kerosene or fuel oil. Nonetheless, the court noted that Gulf delivered large quantities of kerosene in 1949. And in 1960, Woodruff delivered hundreds of gallons of kerosene and hundreds of gallons of a single brand of gasoline — leading the court to conclude that at that time, two tanks must have been in use to store those products.

The court was unable to reconcile the discrepancy between the references to a 1,000-gallon tank and a 1,080-gallon tank in the Gulf documents. The court acknowledged the possibility there were two separate tanks installed on the premises around the same time.

The court reviewed the testimony from Lifrieri and Torkelson, noting they found fuel oil or kerosene, but neither one found evidence of gasoline in the samples they analyzed. The court found that "a very significant finding in the case as it relates to Gulf's exposure." The court found there was insufficient evidence in the record to connect defendants with fuel oil or kerosene contamination.

Regarding fuel oil, the court did not hold Gulf liable, as there was nothing in the record to show it owned fuel oil tanks on the site. The court also declined

17

to find Woodruff liable. The court concluded there was no nexus between Woodruff's filling of the tank and the discharge from the tank leak.

As for kerosene, the court acknowledged that Gulf and then Woodruff, delivered kerosene to the site before Dorrell bought it. The court found it reasonably likely the kerosene was delivered to the AST in the basement. However, there was simply no evidence "that necessarily links Gulf or Woodruff to the discharge, to the contamination" that was found "in the ground."[11]

The court then turned to gasoline. The court analogized the task of determining the nature and source of the contamination to a differential medical diagnosis. The court observed, "we just don't know what was stored" in the Greenwich Street tank; and no one tested its contents. The court acknowledged evidence tending to show that the tank was not used for gasoline, including that pipes from the tank led to the house. However, the court concluded that "if that tank was used for gasoline," then Gulf likely owned it based on the gasoline sales, and retained ownership to the present day.

---

[11] The court also found no connection between defendants and coal contamination. Two experts had mentioned coal as a source of the lead found in the samples. However, plaintiff had not advanced that theory of liability, and thus provided no evidence upon which a court could rely.

Having established ownership, the court turned to the question of contamination. It examined the chemical analyses of the samples taken from various soil borings and test wells. The court concluded, as did Hopkins (and only Hopkins), that gasoline contamination was present, and the contamination demonstrated that the Greenwich Street tank contained gasoline. Although the court noted that no one had excluded off-site sources, he relied on the following findings: the soil boring samples just north of the Greenwich Street UST showed the presence of ethylbenzene, xylene (total), total TIC Volatile and total alkanes, although only the ethylbenzene level exceeded regulatory standards; samples from the test well about twenty feet north of the UST had xylene, total TICs and total alkanes above standards; and test well samples near the northwest corner of the UST included levels of TICs, alkanes and lead above standards.[12] The court found that the presence of lead meant the presence of gasoline, stating "look, lead gasoline, got lead being shown." The court added, "persuasive on [the court's] differential diagnosis is the fact of gasoline that was stored on this site and the fact that somebody owned a tank that that lead would have been stored in that's other than Ms. Dorrell."

---

[12]  The court cited Silverstein's testimony for the proposition that the total TICs and lead from this well's samples indicated potential leaking from the UST.

A-3144-17

The court acknowledged that at the well at the north end of the property, far from the UST, there were also high levels of lead, benzene and TICs. The court stated, "TIC's are . . . relevant to gasoline."[13] The court recognized that "lead isn't exclusive to gasoline"; "there's potential for it to be in the ground"; and it could come from paint or coal ashes (coal was used at the site).

Nonetheless, the court concluded that Gulf, more likely than not, "owns the existing thousand UST that is next to Greenwich Street . . . [and] it would have contained gasoline . . . ." The court acknowledged there remained some uncertainty. But, it concluded, "I've got readings that demonstrate probable contamination of gasoline on the site," and, "we've got readings that are attributable to gasoline that raised the concern that it is from, on the differential diagnosis scale, from, the most likely source, the tank that was storing it." "I'm satisfied . . . that I can find that there's [a] reasonable probability on the proofs

---

[13] Only Hopkins associated TIC levels with gasoline. However, by definition, TICs would appear to exclude a pollutant like gasoline, which can be detected by chemical analysis. Regulations define "TIC" to mean "a non-targeted compound detected in a sample . . . which has been tentatively identified using a mass spectral library search." N.J.A.C. 7:26E-1.8. A "non-targeted compound" is "a compound detected in a sample using a specific analytical method that is not a targeted compound . . . ." Ibid. By contrast, a "targeted compound" is "a hazardous substance, hazardous waste, or pollutant for which a specific analytical method is designed and/or used to detect that potential contaminant both qualitatively and quantitatively." Ibid.

that Gulf is a responsible party for the gasoline contamination" and can order them to "conduct further studies to further develop the extent of th[e] contamination, but also to further develop whether, in fact, that is or [is] not their tank." The court held that Gulf is "deemed the responsible party . . . to the extent that now they have to conduct further remedial investigation to further develop the record as to what's in that tank" and "until such time as they're able to demonstrate that [the] UST is not a gasoline storage facility, if that occurs, then their responsibility would end."

As the trial judge retired shortly after rendering his decision, a different judge considered and denied Chevron's motion for judgment notwithstanding the verdict or, alternatively, a new trial. Chevron argued that the trial court erred in relying on Hopkins's opinion, because it had not qualified him to identify the contaminant at the scene, and reserved on whether Hopkins was qualified to opine about causation, but never rendered a final decision. Chevron also argued that Hopkins offered a net opinion about the contents of the Greenwich Street UST, because he never examined it.

The motion court disagreed. The motion court held that Hopkins properly relied on the laboratories' results, and, "as an LSRP, [was] qualified to testify as to both his charting the laboratory results and the NJDEP standards." Although

21

the motion court reiterated that Hopkins "is not qualified to analyze samples," it found that Hopkins, "[a]s an LSRP . . . with . . . experience investigating sites with petroleum hydrocarbons" was qualified to testify that BTEX was a "signature of gasoline." The motion court also rejected Chevron's argument that Hopkins offered a net opinion about gasoline contamination. The motion court reasoned that Hopkins "relied on the analytic results that he received" from the laboratories, "[h]e did horizontal and cross-sectional mapping," and "he created visual summaries of his investigation." The motion court held that Hopkins's opinion was "based on his investigation, including review of the history of the site, the contracts between Gulf and [the store], his field screenings, and the laboratory results."

The motion court also upheld the trial court's finding of gasoline contamination, noting it was "based on the historic use of the area," the "contracts for the USTs" between Gulf and the store, "the gasoline delivery records, and the groundwater analytical results summarized on" a trial court exhibit. The motion court noted that the exhibit listed levels of benzene, xylene, total TIC Volatile, and alkanes. The motion court asserted that "[a]ll of the experts agreed that BTEX . . . are considered to be a signature of gasoline."

The motion court also found the court reasonably found Chevron, as the successor to Gulf, owned the tank, and it was thus appropriate to order it to participate in further investigation of the site with plaintiff.

Dorrell's appeal, and Chevron's cross-appeal followed. We consider them in turn.

III.

Dorrell contends the court imposed on her a higher burden of proof than the Spill Act and case law requires. Rather than ascertain if there was a nexus between defendants and the contamination, she asserts the court required her to prove defendants were at fault for the damage. Dorrell's appeal turns entirely on interpreting the Court's language in New Jersey Department of Environmental Protection v. Dimant, 212 N.J. 153 (2012).

In Dimant, the New Jersey Department of Environmental Protection (DEP) filed an enforcement action against a dry cleaner and others under the Spill Act. By the time of trial, the dry cleaner was the only direct defendant that remained. In a bench trial, the court found "DEP failed to prove by a preponderance of the evidence that any discharge by [the dry cleaner] caused the groundwater contamination in issue." Id. at 159. This failure thus precluded

23

DEP from compelling contribution from defendant for investigation and cleanup costs. Ibid.

The Supreme Court affirmed the trial court's ruling, but slightly modified and clarified the standard a plaintiff must satisfy in a Spill Act claim for contribution. The Court held that in order to hold a defendant responsible, "[a] reasonable nexus or connection must be demonstrated by a preponderance of the evidence." Dimant, 212 N.J. at 182. "[A] plaintiff need not 'trace the cause of the response costs' to each defendant in a multi-defendant case involving a contaminated site . . ." Ibid. (quoting N.J. Tpk. Auth. v. PPG Indus., Inc., 197 F.3d 96, 105 n.9 (3d Cir. 1999)). However, a plaintiff must do more than "simply prove that a defendant produced a hazardous substance and that the substance was found at the contaminated site and 'ask the trier of fact to supply the link.'" Ibid. (quoting N.J. Tpk. Auth., 197 F.3d at 105 n.9). The Court reaffirmed this view in Magic Petroleum Corp. v. Exxon Mobil Corp., 218 N.J. 390, 408 (2014), where it noted Dimant found "that to recover costs from [a] responsible party, [a plaintiff] must show [a] reasonable nexus between discharge, discharger and contamination at the damaged site."

N.J.S.A. 58:10-23.11g(c)(1) provides that

> any person who has discharged a hazardous substance, or is in any way responsible for any hazardous

substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. Such person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the department or a local unit . . . .

The operative language in plaintiff's appeal thus concerns "any person who . . . is in any way responsible for any hazardous substance . . . ." N.J.S.A. 58:10-23.11g(c)(1). We have previously recognized the phrase "in any way responsible" is to be "broadly construed to encompass either ownership or control over the property at the time of the damaging discharge, or control over the hazardous substance that caused the contamination." N.J. Sch. Dev. Auth. v. Marcantuone, 428 N.J. Super. 546, 559 (App. Div. 2012) (citing Dimant, 212 N.J. at 177-78).

The trial court did not impose a higher burden of proof on plaintiff than Dimant demands. Rather, the court held there was an insufficient connection or nexus between defendants, and a discharge and contamination at the site. The court cited Dimant as not requiring negligence, or fault, but instead that a plaintiff must "demonstrate that there's a connection, a link, a nexus, between the discharge, the ultimate injury that it's caused." The court stated that the nexus could arise from "ownership"; actions "causing the leak, whether that's

negligence or not"; or some other "conduct, . . . [or] act that provides . . . the link" required.

Applying the proper analytical framework, the court committed no error in finding Woodruff not liable for the fuel oil leak in plaintiff's basement. Dorrell effectively asks this court to find that mere delivery of oil, that is at some later point in time discharged from a tank, is sufficient to establish liability. We decline to do so where Woodruff did not own the tank, and where the record fails to establish a contractual responsibility to maintain or inspect the tank.

We also note that plaintiff failed to establish the state of the tank in the basement that leaked the fuel oil. In Dimant, the Court cited favorably to Atlantic City Mun. Utils. Auth. v. Hunt, 210 N.J. Super. 76, 96 (App. Div. 1986), for the proposition that "placement of waste into non-leaking containers does not constitute 'a discharge.'" 212 N.J. at 161-62. Although the parties agree the AST in the basement leaked fuel oil, the trial judge questioned why no investigation was made of the tank to determine the source of the leak. Instead, the tank was replaced without investigation. In order to hold Woodruff liable for delivering fuel, plaintiff was thus obliged to establish when and why the tank leaked oil. If the tank had a small leak leading to oil leaking over time, Woodruff may have been on notice there was an issue if it was delivering more oil than

26

the tank's capacity in order to fill it up.  Or, the tank may have had a burst seam leading to the leak occurring over the course of a few hours.  Failure to establish why the leak occurred doomed plaintiff's claim.

IV.

We turn next to Chevron's cross-appeal of the trial court's order that it perform a remedial investigation on the site.  Chevron challenges the court's finding that gasoline from the Greenwich Street 1000-gallon UST contaminated the site.  Chevron contends the court erred in admitting Hopkins's opinion.  Chevron argues Hopkins was not qualified to determine that gasoline contaminated the site, or that Gulf caused it; and his opinion was, in any event, a net opinion.  Chevron also asserts that it does not own the 1000-gallon tank.  Finally, it argues that if it is required to undertake a remedial investigation, Woodruff and Dorrell should be required to share in investigation costs as well.

As a threshold matter, we briefly address Chevron's argument that it does not own the Greenwich Street 1000-gallon UST.  Even assuming Gulf installed and loaned the tank to the prior store owner, Chevron relies on Sgro v. Getty Petroleum Corp., 854 F. Supp. 1164 (D.N.J. 1994) for the proposition that it was an abandoned fixture that became part of the realty.  Chevron contends that

absent proof the alleged gasoline discharge occurred while it owned the tank, there would be an insufficient nexus between it and the discharge under Dimant.

We are unpersuaded. Chevron misplaces reliance on a rule of law that vindicates the rights of a subsequent property owner or tenant to a presumably valuable fixture that a prior owner abandoned, where the property owner has notice of the fixture and assumes it is part of the property. As one treatise explains, "[T]he only policy justification for forfeiture [is] the protection of subsequent parties who have taken rightful possession of the property and should be free from interruption by a tenant who returns to remove trade fixtures at a later date." 8 Michael Allan Wolf, Powell on Real Property § 57.06[b] (2021).

By contrast, this case involves saddling a subsequent property owner with a fixture that is a burden to the land, about which the subsequent owner had no notice. A tenant who abandons chattels on leased property is liable under the common law for the costs of removal, and "any other damages caused by the abandonment." Restatement (Second) of Property: Landlord & Tenant, § 12.3, cmt. l (Am. Law. Inst. 1977).

However, we need not decide the scope of Dorrell's rights under the common law. A party who abandons a container used for storing potential

pollutants — whether it is an old drum of oil abandoned on the side of the road or an underground tank left in place — remains a person "in any way responsible" for discharges from the property it abandoned. N.J.S.A. 58:10-23.11g(c)(1).

We are also unpersuaded that equity demands that Woodruff and Dorrell share in the remedial investigation, if one occurs. The trial court found Chevron liable for a remedial investigation because it found it more likely than not that gasoline was discharged into the ground from the tank that Gulf and Chevron owned. We recognize that a court may, in exercising its equitable authority, require that multiple potentially responsible parties bear the cost of an investigation where the source of contamination is unclear. Matejek v. Watson, 449 N.J. Super. 179, 181 (App. Div. 2017). However, there was no evidence that Woodruff was responsible for a gasoline discharge, even though it delivered gasoline to the site from 1959 to the early 1960s. Also, Dorrell's alleged failure to discover the tank when she bought the property in 1984 is not a compelling basis to require her to defray Chevron's cost of investigating a discharge from Gulf and Chevron's tank.

We turn to the more significant issue on the cross-appeal: the admissibility of Hopkins's expert opinion. Because Dorrell offered Hopkins's expert opinion,

29

she was obliged to establish its admissibility. See State v. Hyman, 451 N.J. Super. 429, 441 (App. Div. 2017) (stating "the proponent of opinion evidence bears the burden to establish its admissibility"). N.J.R.E. 702 and 703 frame the analysis for admitting expert testimony. Townsend v. Pierre, 221 N.J. 36, 53 (2015).

N.J.R.E. 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." In other words, to satisfy N.J.R.E. 702, expert testimony must satisfy three requirements: "(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony." State v. Kelly, 97 N.J. 178, 208 (1984); see also Townsend, 221 N.J. at 53.

Regarding the third factor, "an expert 'must be "suitably qualified and possessed of sufficient specialized knowledge to be able to express [an expert opinion] and to explain the basis of that opinion."'" Agha v. Feiner, 198 N.J. 50, 62 (2009) (alteration in original) (quoting State v. Moore, 122 N.J. 420, 458-

59 (1991) (further citation omitted)).  Once qualified, an expert witness can only offer opinion testimony within the bounds allowed by the trial judge.  See State v. Locascio, 425 N.J. Super. 474, 490-91 (App. Div. 2012) (finding the trial court erred in allowing a witness qualified to testify as a pathologist to also testify as an expert in accident reconstruction).

N.J.R.E. 703 addresses the foundation of the expert's opinion.  It must "be grounded in facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts."  Townsend, 221 N.J. at 53 (internal quotation marks and further citations omitted).  As a corollary of N.J.R.E. 703, the "net opinion rule" "mandates that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'"  Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)).

To meet the reliability requirement in the case of scientific expert opinion, the proponent must "demonstrate that the expert's opinion or theory was generally accepted within the scientific community."  Kemp ex rel. Wright v.

<u>State</u>, 174 N.J. 412, 424 (2002).[14]  A court must "distinguish scientifically sound reasoning from that of the self-validating expert, who uses scientific terminology to present unsubstantiated personal beliefs."  <u>Landrigan</u>, 127 N.J. at 414.

We generally review decisions to admit expert opinion testimony, like other evidentiary decisions, under an abuse of discretion standard.  <u>Townsend</u>, 221 N.J. at 53.  That discretion extends to the decision whether the expert possesses the necessary qualifications.  <u>Ryan v. Renny</u>, 203 N.J. 37, 50 (2010).  "[A]n abuse of discretion 'arises when a decision is "made without a rational explanation, inexplicability departed from established policies, or rested on an

---

[14]  Our court applied a more relaxed standard focused on the underlying methodology in cases involving novel theories of causation in toxic tort cases.  <u>Kemp</u>, 174 N.J. at 424-25 (stating that "a theory of causation that had not yet reached general acceptance in the scientific community 'may be found to be sufficiently reliable if it is based on a sound, adequately-founded scientific methodology involving data and information of the type reasonably relied on by experts in the scientific field'") (quoting <u>Rubanick v. Witco Chem. Corp.</u>, 125 N.J. 421, 449 (1991)).  After trial in this case, the Court in <u>In re Accutane Litigation</u>, 234 N.J. 340 (2018), adopted, for scientific expert testimony in civil cases, aspects of the test in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). The Court's approach "requires the proponent to demonstrate that the expert applies his or her scientifically recognized methodology in the way that others in the field practice the methodology."  <u>Accutane</u>, 234 N.J. at 399-400.  The trial court should exclude expert testimony as unreliable "[w]hen a proponent does not demonstrate the soundness of a methodology, both in terms of its approach to reasoning and to its use of data, from the perspective of others within the relevant scientific community."  <u>Id.</u> at 400.

impermissible basis."'" State v. R.Y., 242 N.J. 48, 65 (2020) (quoting Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (further citation omitted)). In particular, an appellate court owes no deference to an evidentiary ruling if the trial court failed to apply the correct standard for admissibility. State v. Darby, 174 N.J. 509, 518 (2002) (reviewing de novo admissibility of other crimes and wrongs evidence where trial court failed to apply standard for admissibility); Konop v. Rosen, 425 N.J. Super. 391, 401 (App. Div. 2012) (stating an appellate court reviews de novo a trial court evidentiary ruling where the court failed to apply the correct test). We also will find an abuse of discretion in the case of a clear error of judgment, or a manifest injustice. Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019).

However, not all evidentiary rulings are subject to the abuse-of-discretion standard of review. "Whether expert testimony is sufficiently reliable to be admissible under N.J.R.E. 702 is a legal question" that an appellate court reviews de novo. State v. J.L.G., 234 N.J. 265, 301 (2018); see also State v. Harvey, 151 N.J. 117, 167-68 (1997) (stating that an appellate court "reviewing a decision on the admission of scientific evidence . . . should scrutinize the record and independently review the relevant authorities, including judicial opinions and scientific literature").

We apply these principles first to the issue of Hopkins's qualification to opine that the contaminant found was gasoline. The motion court recognized that Hopkins was not qualified to "analyze" samples. But, the trial court's initial ruling went further. The trial court held that Hopkins was not qualified to "identify" the hydrocarbons, and instead relied on other experts to do so. The court's decision was justified.

However, Dorrell's counsel later elicited Hopkins's opinion, identifying the contaminant as gasoline. Chevron objected that the opinion was outside the scope of his qualifications the court previously determined. The court allowed the testimony subject to what amounted to its reconsideration of its previous decision. But, the court never returned to Hopkins's qualifications.

As we noted, essential to the admissibility of an expert's opinion under N.J.R.E. 702 is proof that the expert has the qualifications to offer it. We are constrained to conclude that the trial court abused its discretion by admitting Hopkins's opinion that the contaminant in the soil and water at the site was gasoline, absent a finding he was qualified to give it.

We recognize that Hopkins grounded his opinion in part on what we view as circumstantial evidence. He found samples with elevated readings of various contaminants near the 1000-gallon Greenwich Street tank. He considered the

historic use of the site for gasoline storage and sales. However, an essential element of his opinion that the contaminant was gasoline rested on Hopkins's analysis of various chemicals, including lead and BTEX, which he opined were "signatures" or "markers" of gasoline. Notably, Hopkins did not testify during his voir dire that he had the training or experience to distinguish between various petroleum products and to identify gasoline among them, based on the kind of data he utilized. During trial, he admitted that various other chemicals are closely associated with leaded gasoline; he obtained tests of those for samples taken from other locations on the property; but he did not obtain those tests for the samples he asserted contained gasoline. He also admitted that specific forms of lead were associated with gasoline, but he relied on total lead readings as the foundation of his opinion.

Nor are we convinced that, as an LSRP, Hopkins necessarily was qualified to identify gasoline. The motion court held that "[a]s an LSRP and with his experience investigating sites with petroleum hydrocarbons," Hopkins was qualified to testify that BTEX was a "signature of gasoline" and his "charting the laboratory results."[15]

---

[15] The motion court's conclusion that "[a]ll of the experts agreed that BTEX . . . are considered to be a signature of gasoline" is unsupported by the record, if the

A-3144-17

We are unconvinced. A discharger or a person in any way responsible for a discharge is required to hire an LSRP to perform remediation. N.J.S.A. 58:10B-1.3. Remediation may encompass a remedial investigation that includes identifying the nature of contamination. N.J.S.A. 58:10C-2 (defining "remediation" and "remedial investigation"). However, the statute recognizes that an LSRP may be required to rely on other professionals to perform tasks he or she is not qualified to perform. "A licensed site remediation professional shall not provide professional services outside the areas of professional competency, unless the licensed site remediation professional has relied upon the technical assistance of another professional whom the licensed site remediation professional has reasonably determined to be qualified by education, training, and experience." N.J.S.A. 58:10C-16(c). Thus, qualification as an LSRP does not necessarily imply qualification to identify specific petroleum contaminants based on the data Hopkins utilized.

The trial court also never decided that Hopkins was qualified to offer an opinion about causation. At the beginning of trial, the court stated it was "not

court meant by "signature" that BTEX was uniquely found in gasoline. Lifrieri testified that BTEX is found in fuel oil, as well. Furthermore, as noted, the laboratories never reported the presence of gasoline. They reported the presence of various other chemicals. The issue is whether Hopkins was qualified to infer that gasoline was present based on that chemical array.

prepared . . . without more foundation, without more specifics, to be able to say [Hopkins was] qualified . . . to give what I'll call proximate cause opinions." The court did not foreclose Dorrell from making such a showing. But, the court did not expressly revisit the issue.

Even assuming Hopkins was a qualified witness, the record does not disclose that the facts and methods he used to identify gasoline, and attribute it to Gulf, were reliable. As noted, the "net opinion rule" required Hopkins to "demonstrate that both the factual bases and the methodology [of his opinion] were reliable." Townsend, 221 N.J. at 53 (quoting Landrigan, 127 N.J. at 417). The record contains no such demonstration. Hopkins certainly described the basis for his opinion, including the presence of certain chemicals, the proximity of the 1000-gallon UST, and the historic use of the site. However, Hopkins referred to no scientific sources or evidence to demonstrate that his methodology was reliable; or that it was generally accepted within the field of environmental assessment and investigation.

Rather, the evidence at trial disclosed other reliable methods of identifying gasoline and determining its source, which Hopkins chose not to use. Hopkins conceded that to determine whether leaded gasoline was present, one would test for several chemicals; yet, he did not order those tests for the samples

37

taken near the 1000-gallon UST. The other experts identified particular petroleum products through the use of chromatograms and other sophisticated technologies. Those methods were applied to samples from the basement and the test well north of the building; but, not applied to samples near the 1000-gallon UST, or where gasoline was sold.[16] Hopkins also never inspected the 1000-gallon UST, to determine if it was corroded or cracked; nor did he try to sample and test the tank's contents.

We conclude it is appropriate to remand for an N.J.R.E. 104 hearing to determine the admissibility of Hopkins's opinions, both based on his qualifications, and the reliability of his methodology. We recognize that Dorrell bore the burden to establish the admissibility of Hopkins's opinion, but the issue was joined and the court never returned to the issue so as to put Dorrell to the test. Furthermore, during trial, Chevron did not object to Hopkins's opinion on the ground it was a net opinion.[17] The argument was raised in a post-trial

---

[16] Dorrell excuses Hopkins's decision not to utilize those tests on the samples taken near the 1000-gallon UST, because the samples were dissolved in the groundwater, as opposed to "product" that floated atop the groundwater. However, Hopkins presented no evidence of the reliability of that methodology.

[17] We recognize that Chevron's counsel made a passing reference to "net opinion" in oral argument on the motion for involuntary dismissal after Dorrell rested. However, Chevron did not expressly challenge the reliability of Hopkins's methodology.

motion. Neither party requested an N.J.R.E. 104 hearing to ascertain the reliability of Hopkins's methodology. "[T]he sounder practice is to afford the proponent of the expert's opinion an opportunity to prove its admissibility at a Rule 104 hearing." Kemp, 174 N.J. at 432-33.

At the hearing, Hopkins shall have the opportunity to demonstrate his qualifications and the reliability of the methodology he used. Chevron shall be entitled to offer its own expert in response to these questions. The trial court shall assure the hearing is limited to the issues of Hopkins's qualifications at the time he testified at trial and the reliability of the methodology, as it existed at the time of trial, supporting the opinions concerning the identification of gasoline and its source on the property that he offered at trial, and does not transform into a re-trial. Whether pre-hearing exchanges are warranted is left to the trial court's discretion.

If the court on remand determines that Hopkins was not qualified to identify the contaminant as gasoline or opine about causation, or that his methodology was not reliable, then the judgment of the trial court with respect to Chevron shall be vacated. However, if the court determines that Hopkins was qualified to identify gasoline as a contaminant, and the factual bases and methodology he used were reliable, then the order shall be enforced.

Affirmed on the appeal.  Remanded on the cross-appeal.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3144-17